# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEW MEXICO

In re:   FIRST STATE BANCORPORATION,                              No. 7-11-11916 JA

        Debtor.

LINDA S. BLOOM, as Chapter 7 Trustee
for First State Bancorporation,

        Plaintiff,

v.                                                                Adversary No.  13-1033 J

FEDERAL DEPOSIT INSURANCE
CORPORATION, as receiver for
First Community Bank,

        Defendant.

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on the Motion to Dismiss Count I of Trustee's

Complaint ("Motion to Dismiss Count I") filed by the Federal Deposit Insurance Corporation, as

receiver ("FDIC-R") for First Community Bank, Taos, New Mexico ("Bank").  *See* Docket No.

23.  The Court heard oral argument on the Motion to Dismiss Count I and took the matter under

advisement.  The Debtor, First State Bancorporation ("Bancorp"), is a bank holding company for

the Bank.  FDIC-R filed a proof of claim in Bancorp's bankruptcy case asserting an unsecured

priority claim under 11 U.S.C. § 507(a)(9) in the amount of $63,821,000.00 based on an alleged

commitment to maintain the capital of the Bank.  Linda S. Bloom, the Chapter 7 Trustee in

Bancorp's bankruptcy case, filed this adversary proceeding objecting to FDIC-R's proof of claim

(Count I) and seeking to avoid Bancorp's alleged commitment to maintain the capital of the

Bank as a constructively fraudulent transfer under 11 U.S.C. § 548 (Count II).  *See* Complaint for

Avoidance of Fraudulent Conveyance and Objection to Claim No. 9-1 (the "Complaint") – Docket No. 1.

Count I of the Complaint asserts five grounds in support of the Trustee's objection to FDIC-R's claim:  1) none of the documents that FDIC-R relies upon in support of its claim commits Bancorp to be liable for the shortfall in the Bank's capital (i.e., Bancorp  did not make a commitment to maintain the capital of the Bank);  2) even if Bancorp made a commitment to maintain the capital of the Bank, the commitment was not made to a "Federal Depository Institutions Regulatory Agency" under 11 U.S.C. § 507(a)(9);  3) any commitment to maintain the capital of the Bank terminated pre-petition when the Bank was placed in receivership; 4) FDIC-R lacks standing to enforce the alleged commitment to maintain the capital of the Bank; and 5)  FDIC-R failed to timely file its proof of claim.  FDIC-R's Motion to Dismiss Count I addresses each of these theories.

After considering the Motion to Dismiss Count I, the Trustee's response, and the FDIC-R's reply, as well as counsel's oral arguments, the relevant case law, and the applicable statutes, the Court finds for the reasons set forth below that all but one of the Trustee's theories fail as a matter of law.  The Court will, therefore, grant, in part, and deny, in part the Motion to Dismiss Count I.

    A.  The Standards for Considering a Motion to Dismiss and Whether the Court Must Turn the Motion to Dismiss into a Motion for Summary Judgment

The Court reviews a motion to dismiss for failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6) by accepting as true all well-pleaded facts in the Complaint  and viewing those facts in the light most favorable to the non-moving party.  *See Alvarado v. KOB-TV, L.L.C.,* 493 F.3d 1210, 1215 (10th Cir. 2007)(stating that under Fed.R.Civ.P. 12(b)(6), the Court "must accept all the well-pleaded allegations of the complaint

as true and must construe them in the light most favorable to the plaintiff.")(citation and internal quotation marks omitted).  To survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), the complaint must contain enough facts to state a cause of action that is "plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S.662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)(citing *Twombly,* 550 U.S. at 556).

The Court's function in deciding a 12(b)(6) motion is "to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1201 (10th Cir. 2003)(citations and quotation marks omitted). Thus the Court ordinarily may not consider documents outside the four corners of the complaint to resolve a 12(b)(6) motion without converting the motion into a motion for summary judgment. *See* Fed.R.Civ.P. 12(d)("If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented and not excluded by the court, the motion must be treated as one for summary judgment . . . ."); *GFF Corp. v. Associated Wholesale Grocers, Inc.,* 130 F.3d 1381, 1384 (10th Cir. 1997)("The failure to convert a 12(b)(6) motion to one for summary judgment where a court does not exclude outside materials is reversible error unless the dismissal can be justified without considering the outside materials.")(citation omitted).  But if a document is central to a plaintiff's claims, is referenced by the plaintiff in the complaint, and is not disputed with respect to its authenticity, the Court may consider the document on a motion to dismiss without converting the motion to dismiss into a motion for summary judgment. *Alvarado v. KOB-TV,* 493 F.3d at 1215 ("[N]otwithstanding the usual rule that a court should consider no evidence beyond the pleadings on a Rule 12(b)(6) motion to dismiss, 'the district court may consider documents referred to in

-3-

the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'")(quoting *Jacobsen v. Deseret Book Co,* 287 F.3d 936, 941 (10th Cir. 2002)); *GFF Corp. v. Wholesale Grocers,* 130 F.3d at1384 ("Notwithstanding these general principles, if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.")(citations omitted). While the Court may consider these types of documents in ruling on a motion to dismiss, it is not required to do so. *Prager v. LaFaver,* 180 F.3d 1185, 1189 (10th Cir. 1999)(finding that *GFF* does not require the court to consider documents attached to a motion to dismiss that plaintiff referenced in its complaint, and collecting cases which indicate that "courts have discretion in deciding whether to consider such materials.")(citations omitted); *Midas Auto Sales, Inc. v. Holley (In re Holley),* 2013 WL 1912666, *1 (Bankr.D.N.M. May 9, 2013)("The Court has broad discretion to refuse to accept the extra-pleading materials and resolve the motion solely on the basis of the pleading itself.")(citations omitted).

FDIC-R did not attach any documents to its Motion to Dismiss Count I, but references in its Motion to Dismiss Count I several documents that it attached to its proof of claim filed in Bancorp's bankruptcy case. Specifically, the Motion to Dismiss Count I references the following documents:

A. Bancorp's Securities and Exchange Commission Form 10-Q dated May 17, 2010 (the "May 10-Q").

B. Letter from the Federal Reserve Bank of Kansas City to Bancorp dated May 25, 2010 (the "May 25, 2010 Letter").

C. A letter dated June 14, 2010 from the Bank to The Federal Reserve Bank of Kansas City and to the Financial Institutions Division, State of New Mexico enclosing the capital restoration plan (the "June 14, 2010 Letter").

-4-

D.     The capital restoration plan for Bancorp and the Bank dated June 2010 (the "Capital Restoration Plan").

E.     The Bank Holding Company Resolution dated June 14, 2010 ("Bancorp's Board Resolution").

F.     The Prompt Corrective Action Directive issued by the Board of Governors of the Federal Reserve System with respect to the Bank dated August 26, 2010 (the "Prompt Corrective Action Directive").

G.     Bancorp's Securities and Exchange Commission Form 10-Q dated November 10, 2010 ("Bancorp's November 10-Q").

A copy of each of these documents is attached to FDIC-R's proof of claim.  *See* Claim No. 9-2 filed in Bancorp's bankruptcy case.  Also attached to FDIC-R's proof of claim is a copy of a Written Agreement by and among Bancorp, the Bank, the Federal Reserve Bank of Kansas City and the New Mexico Regulation and Licensing Department, Financial Institutions Division dated July 2, 2009 (the "July 2, 2009 Written Agreement" ).  *See* Claim No. 9-2 – Exhibit A. The Trustee's Complaint, though it does not attach any documents as exhibits, also references all of the documents attached to FDIC-R's proof of claim, except for the May 10-Q:

A.  May 25, 2010 Letter – Complaint ¶ 24.

B.  June 14, 2010 Letter – Complaint ¶ 27.

C.  The Capital Restoration Plan – Complaint, ¶¶ 28 and 29.

D.  Bancorp's Resolution – Complaint ¶ 30.

E.  Prompt Corrective Action Directive – Complaint ¶ 32.

F.  Bancorp's November 10-Q – Complaint ¶ 34.

G.  July 2, 2009 Written Agreement – Complaint ¶ 19.

At the oral argument on the Motion to Dismiss Count I, the Court asked counsel for the Trustee whether she contested the authenticity of any of the documents upon which FDIC-R relies in its Motion to Dismiss Count I.  Counsel for the Trustee conceded that she did not

question the authenticity of the documents, but disputes their meaning, and maintains that the documents do not tell the complete story. She points out that it would be unusual at this stage in the proceeding, where discovery has not been completed, for the Court to consider documents outside the Complaint in ruling on the Motion to Dismiss Count I. The Court indicated at the close of the hearing that it would consider whether to convert the Motion to Dismiss Count I into a motion for summary judgment and afford the parties time to submit additional documents and to file additional briefs. However, after reviewing the Motion to Dismiss Count I in light of the Complaint and the FDIC-R's proof of claim, the Court has determined that it is appropriate to consider the above listed documents referenced in the Complaint, except the May 10-Q, in ruling on the Motion to Dismiss Count I without converting the motion into a motion for summary judgment. The documents are central to the Trustee's claim with respect to the alleged capital maintenance guaranty. She does not contest the authenticity of the documents and references the documents in her Complaint.

B. Facts Raised in the Complaint and Supported by Documents Referenced in the Complaint

Bank was wholly owned by Bancorp. (Complaint ¶ 10).[1] The Federal Reserve Bank of Kansas City (the "Federal Reserve Bank") supervised the Bank, under delegated authority from the Board of Governors of the Federal Reserve System (the "Board of Governors"). (Complaint ¶ 12). From 2007 to 2009 the capital of Bancorp and the Bank eroded, and in July of 2009 Bancorp and the Bank entered into the July 2, 2009 Written Agreement to address insufficient capital of Bancorp and the Bank on a consolidated basis. (Complaint ¶ 19). The Federal Reserve Bank downgraded the Bank's CAMELS[2] composite rating as of August 2009 to level 5.

---

[1]The Court accepts the allegations of the Complaint as true for purposes of ruling on the Motion to Dismiss Count I.
[2]CAMELS is the rating system the FDIC uses to rate the financial condition of federally insured depository institutions. *See Schoenmann v. Fed. Deposit Ins. Corp.,* 2012 WL 3834943, *1 n. 4 (N.D.Cal. Sept. 4, 2012). The

(Complaint ¶ 21).  As of Mach 31, 2010, the Federal Reserve Bank notified Bancorp that the Bank was "undercapitalized" for purposes of 12 U.S.C. § 1831o and Subpart D of Regulation H (12 C.F.R. Part 208, Subpart D), and required the Bank to submit a capital restoration plan which must include Bancorp's "guarantee that the Bank will fully comply with the [capital restoration] plan until such time as the Bank maintains adequately capitalized capital ratios for four consecutive calendar quarters and . . . appropriate assurances of performance by [Bancorp] under the guarantee." ).  *See* May 25, 2010 Letter and Complaint ¶¶ 23 - 25.  The May 25, 2010 letter provided further that Bancorp:

> Provide to the [Federal] Reserve Bank a written commitment to take all of the actions required by the capital restoration plan and any other actions that are necessary to ensure that the plan is fully implemented by the Bank.

Bancorp and the Bank prepared a capital restoration plan (the "Capital Restoration Plan") in June of 2010 which the Bank submitted to the Federal Reserve Bank and to the Financial Institutions Division, State of New Mexico on June 14, 2010.  *See* June 14, 2010 Letter.  The major components of the Capital Restoration Plan consisted of the following:

1. Securing the commitment of a substantial investor for up to 24.9% of the total capital to be raised, with 9.9% in voting common stock and up to an additional 15% in non-voting stock.

2. A private offering for new common equity from 25-40 investors, in an amount of $250 – 300 million in total to be accomplished with the assistance of Goldman Sachs. The total raised will include the amount secured from the substantial investor in item number 1 above.

3. Retirement of a significant majority of [Bancorp's] Trust Preferred debt at a substantial discount, with the assistance of Hexagon Securities.

    Capital Restoration Plan; *See also,* Complaint ¶ 29.

---

six components of a CAMELS rating are: "Capital Adequacy," "Asset Quality," "Management," "Earnings," "Liquidity," and "Sensitivity to Market Risk."  *American Capital Corp. v. United States,* 63 Fed.Cl. 637, 693 n.40 (Fed.Cl. 2005).

The projected timeline for implementing the Capital Restoration Plan estimated a completion date of September 30, 2010 for "[c]losing of the TruPS redemption and capital raise." *Id.* The Capital Restoration Plan also stated, based on an assessment performed by the principals of Mill Creek Capital, that "it is reasonable to believe that a capital infusion into the bank of $200-240 million should be sufficient to allow the bank to maintain a well capitalized position as it continues through the current business cycle" and that "it is believed that the pro-forma rates of return that should be achievable are sufficient to attract sophisticated, knowledgeable investors who would be capable of providing funds sufficient to raise the targeted amount of capital." *Id.* Finally, the Capital Restoration Plan stated that if the retirement of Bancorp's trust preferred debt "is not proceeding more or less as planned, an alternative structure that could allow for capital injection directly into the Bank is being evaluated" and that "[t]he status of the TruPS redemption will be evaluated in early July and a decision made at that point about the viability of pursuing this alternative." *Id.*

Bancorp's Board Resolution was included as part of the Capital Restoration Plan. Bancorp's Board Resolution ensured compliance with the Capital Restoration Plan, and contains the following recitals:

> Each company having control of an insured depository institution that is undercapitalized must: (1) guarantee that the institution will comply with its capital restoration plan until the institution has been adequately capitalized on average during each of four consecutive calendar quarters; and 2) provide appropriate assurances of performance, in order for the institution's primary federal regulator to accept the institution's capital restoration plan.

> [Bancorp] desires to execute this Resolution in order to provide an adequate guarantee of the Capital [Restoration] Plan so that the Board of Governors may accept the Capital [Restoration] Plan.

Bancorp's Board Resolution also contains the following resolutions:

[Bancorp] shall take all actions required of it under the Capital [Restoration] Plan, including but not limited to raising a minimum of $200 million in capital in a private offering to be injected into the Bank;

[Bancorp] shall ensure that the Bank complies with each of the requirements prescribed by Section 38 and Regulation H, and any other requirement impose on the Bank by the Board of Governors pursuant to section 38 and Regulation H;

[Bancorp] shall take no action to diminish the capital level of the Bank. Specifically [Bancorp] shall ensure that the Bank will not pay dividends, until such time as it is adequately capitalized within the meaning of Section 38 and Regulation H;

[Bancorp] hereby acknowledges that its guarantee of the Capital [Restoration] Plan as set forth in this Resolution and the Written Agreement dated July 2, 2009 between [Bancorp] and the Federal Reserve Bank of Kansas City shall constitute a commitment to the Board of Governors to maintain the capital of the Bank, as set forth in section 365(o) of the United States Bankruptcy Code (11 U.S.C. § 365(o)).

The Prompt Corrective Action Directive issued by the Bank and the Board of Governors confirmed that the Board of Governors determined that the Bank was "significantly undercapitalized" for purposes of 12 U.S.C. § 1831o, and that the Board of Governors had accepted the Capital Restoration Plan dated June 14, 2010. (Complaint ¶ 32).

Bancorp's efforts to carry out the Capital Restoration Plan included the following: a) initiating repurchase offers for all of the outstanding trust preferred securities debt at a significant discount to par value; and b) engaging an investment banking firm to bring in investor groups for a potential whole bank repurchase. (Complaint ¶¶ 35 and 36). The trust preferred securities holders did not accept the repurchase offers and Bancorp had no authority to force the trust preferred securities holders to accept the discounted offers. (Complaint ¶ 35). Bancorp proposed a transaction with a single private equity firm called Mill Creek Capital which would raise sufficient funds from its investors to satisfy the capital raising terms of the Capital Restoration Plan and dilute Bancorp's holdings in the Bank to one percent (the "Mill Creek Transaction"). (Complaint ¶ 36). The Federal Deposit Insurance Corporation did not select the Mill Creek

-9-

Transaction "as it preferred a whole bank purchase by another bidder with whom it had been negotiating a purchase and assumption agreement."  Complaint, ¶ 36.

The Federal Deposit Insurance Corporation closed the Bank and was appointed as receiver for the Bank on January 28, 2011.  (Complaint ¶ 37).  The same day FDIC-R entered into a purchase and assumption agreement with U.S. Bank, National Association, to purchase the Bank's assets and assume the Bank's debts. (Complaint ¶ 37).  Bancorp filed a voluntary petition under Chapter 7 of the Bankruptcy Code on April 27, 2011. (Complaint ¶ 38).  Linda S. Bloom was appointed the Chapter 7 Trustee. (Complaint ¶ 38).  FDIC-R filed its proof of claim based on Bancorp's alleged commitment to maintain the capital of the Bank on October 24, 2011. (Complaint ¶ 40). FDIC-R amended its claim on January 4, 2013.  (Complaint ¶ 40).

C.  Claims Asserted in Count I

1)  *Whether Bancorp Made a Commitment to Maintain the Capital of the Bank*

In support of its position that Bancorp made a commitment to maintain the capital of the Bank, FDIC-R relies in part on the language contained in Bancorp's Board Resolution  which provided that Bancorp's "guarantee of the Capital Plan  . . . shall constitute a commitment to the Board of Governors to maintain the capital of the Bank, as set forth in section 365(o) of the United States Bankruptcy Code (11 U.S.C. § 365(o))."  *See* Bancorp's Resolution.  This language tracks the language found in 11 U.S.C. § 365(o):

> In a case under chapter 11 of this title, the trustee shall be deemed to have assumed (consistent with the debtor's other obligations under section 507), and shall immediately cure any deficit under, any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution, and any claim for a subsequent breach of the obligations thereunder shall be entitled to priority under section 507.  This subsection shall not extend any commitment that would otherwise be terminated by any act of such an agency.
>
> 11 U.S.C. § 365(o).

Courts interpreting this Code section, including the Tenth Circuit, conclude that a debtor who has made a commitment to maintain the capital of a failed depository institution must immediately cure any deficit under the commitment as a condition to remaining in Chapter 11. *See, e.g., In re Overland Park Fin. Corp.,* 236 F.3d 1246, 1253 (10th Cir. 2001)(holding that, "before a debtor may proceed with Chapter 11, and acquire Chapter 11 protection, the debtor's commitment to assume and cure its capital deficit must be satisfied."); *Resolution Trust Corp. v. Firstcorp, Inc. (In re Firstcorp, Inc.)*, 973 F.2d 243, 247 (4th Cir. 1992)("We think that the meaning and function of § 365(o) is plain from its language: in every Chapter 11 case, the trustee . . . 'shall be deemed to have assumed' any capital maintenance commitment made by the debtor, and if a deficit under such commitment arises, he 'shall immediately cure [it].'")(quoting § 365(o)); *Franklin Sav. Corp. v. Office of Thrift Supervision,* 303 B.R. 488, 502 (D.Kan. 2004)("Section 365(o) explicitly requires a cure of any capital maintenance commitment, and *Firstcorp* and *Overland Park Financial* both hold that this cure is a prerequisite to Chapter 11."). The consequence of failing to satisfy the requirements of 11 U.S.C. § 365(o) is conversion to Chapter 7. *See Firstcorp,* 973 F.2d at 248 (concluding "that assumption of a capital maintenance obligation and cure of a deficit under such an obligation are pre-requisites to reorganization under Chapter 11[;]" and observing further that § 365(o) denies a holding company that is not able to satisfy its capital maintenance obligations the "opportunity to reorganize under Chapter 11, leaving liquidation under Chapter 7 as its only option."); *Franklin,* 303 B.R. at 502 ("The remedy for a debtor's inability to cure the capital deficiency is that the debtor may be prohibited from proceeding under Chapter 11.").

Section 365(o) is inapplicable here because Bancorp is not attempting to reorganize under Chapter 11. The policy argument that Chapter 11 cannot be used by a bank holding company

that has made a commitment to maintain the capital of its subsidiary bank "to jettison the subsidiary in an effort to enhance its own financial position and that of its creditors," is not applicable in a Chapter 7 liquidation case. *Firstcorp,* 973 F.2d at 248. *See also,* H.R.Rep. No. 681(1), 101st Cong., 2d Sess. 179 (1990), reprinted in 1990 U.S.C.C.A.N. 6572, 6585 (the purpose of 11 U.S.C. § 365(o) is "to prevent institution-affiliated parties from using bankruptcy to evade commitments to maintain capital reserve requirements of a Federally insured depository institution.").

Even though 11 U.S.C. § 365(o) has no application in Chapter 7 cases, the "commitment to maintain the capital" language found in 11 U.S.C. § 365(o) is likewise found in 11 U.S.C. § 507(a)(9), which establishes the priority of claims in chapter 7, 11, 12 and 13 cases. *See* 11 U.S.C. § 103(a)(chapters 1, 3, and 5 of this title apply in a case under chapter 7, 11, 12, or 13 of this title . . ."). That section provides:

> Ninth, allowed unsecured claims based upon any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution.
>
> 11 U.S.C. § 507(a)(9).[3]

The language in the Board Resolution tracks this same language, notwithstanding its reference to 11 U.S.C. § 365(o). *See* Board Resolution (Bancorp "acknowledges that its guarantee of the Capital Plan as set forth in this Resolution and the Written Agreement dated July 2, 2009 . . . shall constitute a **commitment to the Board of Governors to maintain the capital of the Bank,** as set forth in section 365(o) of the United States Bankruptcy Code (11 U.S.C. § 365(o)).").

---

[3]To be accepted by the applicable regulatory agency, a capital restoration plan required by FIRREA must be "likely to succeed in restoring the institution's capital." 12 U.S.C. § 1831o(e)(2)(C)(i)(II). A bank holding company's guaranty of a capital restoration plan for an undercapitalized institution continues "until the institution has been adequately capitalized on average during each of 4 consecutive calendar quarters." 12 U.S.C. § 1831o(e)(2)(C)(ii)(I). A requirement to *restore* the capital for four consecutive calendar quarters equates to a requirement to *maintain* an institution's capital.

-12-

In *Overland Park,* the Tenth Circuit construed the meaning of "commitment" for purposes of 11 U.S.C. § 365(o).  *Overland Park,* 236 F.3d at 1252.  The Tenth Circuit rejected the idea that "any commitment by the debtor . . . to maintain the capital" under § 365(o) requires that the commitment "be contractual, executory, [or] formal[.]"  *Id.*  Instead, a commitment, based on its common definition, simply requires an "'[a]greement or pledge to do something.'"  *Id.* (quoting *Firstcorp.* 973 F.2d at 249 n. 5)(quoting Black's Law Dictionary 248 (5th Ed. 1979)(additional internal quotation marks omitted)).  The Tenth Circuit concluded that the mandatory, unequivocal language contained in a stipulation signed by the debtor's president constituted a "unilateral pledge to maintain . . . [the bank's] capital" that qualified as a commitment for purposes of 11 U.S.C. § 365(o). *Id.* at 1253.

The Trustee contends that Bancorp did not make a commitment to maintain the capital of the Bank because none of the documents that FDIC-R relies upon in support of its claim obligate Bancorp to infuse its own capital to restore the capital of the Bank.  Several of the cases that the Trustee relies upon do appear to focus on whether the alleged commitment required the bank holding company to infuse its own capital.  *See, e.g., Firstcorp,* 973 F.2d at 244 and 249 (finding a commitment to maintain capital where the language required the infusion of sufficient additional equity capital); *In re Colonial BancGroup, Inc.,* 436 B.R. 713, 733 (Bankr.M.D.Ala. 2010)(finding no commitment to maintain capital where "[t]he language in the three documents did not require the Debtor to maintain the net worth of the Bank or to infuse additional capital as necessary . . . "); *In re Vineyard Nat'l Bancorp.,* 2013 WL 1867986, *4 (Bankr.C.D.Cal. May 3, 2013)(finding no commitment to maintain capital where there was no "commitment that binds the Debtor to infuse capital to the Bank.").  Even in *Overland Park,* the stipulation at issue "evince[d] [the debtor's] understanding [that] it is obligated to maintain, and if necessary infuse,

capital in order to ensure . . . compliance with federal regulatory code." *Overland Park,* 236 F.3d at 1253-1254. But nothing in 11 U.S.C. § 365(o) or 11 U.S.C. § 507(a)(9) requires "a commitment to 'infuse equity capital'" in order to constitute a commitment to maintain the capital of an FDIC-insured bank. *Fed. Deposit Ins. Corp. v. Amtrust Fin. Corp.,* 2011 WL 334976, *9 (N.D.Ohio Jan. 31, 2011), *aff'd,* 694 F.3d 741 (6th Cir. 2012).

Section 507(a)(9) gives priority status to "any commitment" to maintain an insured depository institution's capital. 11 U.S.C. § 507(a)(9). *See also, Vineyard,* 2013 WL 1867986 at * 2 (acknowledging that "[t]he 'commitment' can be 'any commitment.'"). To determine whether Bancorp made a commitment to maintain the capital of the Bank, the Court is guided by *Overland Park's* simple requirement that a commitment to maintain the capital may take the form of a pledge or commitment to do something, and need not take the form of a contract. *Overland Park,* 236 F.3d at 1252. To complete this task, the Court must examine the language contained in the documents, and, because the Board Resolution references the Capital Restoration Plan and the July 2, 2009 Written Agreement, it is appropriate to consider all of these documents together to interpret its meaning. *Cf. Restatement (Second) of Contracts,* § 209(1) (1981)("An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement."). Reading the Board Resolution together with the Capital Restoration Plan and the July 2, 2009 Written Agreement, the Court concludes that Bancorp made a commitment to maintain the capital of the Bank.

As noted above, the language in the Board Resolution uses the same words found in 11 U.S.C. § 507(a). The Board Resolution also contains the following recitals and resolutions:

> WHEREAS . . . each company having control of an insured depository institution that is undercapitalized must: (1) guarantee that the institution will comply with its capital restoration plan . . . and (1) provide appropriate assurance of performance . . .

-14-

WHEREAS BHC [Bancorp] desires to execute this Resolution in order to provide an adequate guarantee of the Capital [Restoration] Plan so that the Board of Governors may accept the Capital [Restoration] Plan.

RESOLVED, that . . . BHC [Bancorp] shall ensure that: (1) all actions required by the Capital Plan are taken by the Bank and BHC [Bancorp]; and (2) the Capital [Restoration] Plan is fully implemented.

RESOLVED, that BHC [Bancorp] shall take all actions required of it under the Capital Plan, including but not limited to raising a minimum of $200 million in capital in a private offering to be injected into the Bank.

Board Resolution.

Bancorp is a party to the July 2, 2009 Written Agreement. The July 2, 2009 Written Agreement required Bancorp to submit an acceptable written plan to address "the source and timing of additional funds to fulfill the consolidated organization's and the Bank's future capital requirements." July 2, 2009 Written Agreement, p. 7. The Capital Restoration Plan contemplates that the Bank's capital will be restored by raising capital from third-party sources, and by retiring the Bank's "Trust Preferred debt at a substantial discount." *See* Capital Restoration Plan. The Capital Restoration Plan also contemplates that if the effort to retire trust preferred debt is "not proceeding more or less as planned, an alternative structure that could allow for a capital injection directly into the Bank is being evaluated." *Id.* at Conclusions, ¶ 4. The Board Resolution, read together with the July 2, 2009 Written Agreement and the Capital Restoration Plan indicate that Bancorp pledged to ensure that the terms of the Capital Restoration Plan are carried out. The Board Resolution clearly states that Bancorp executed the Board Resolution "to provide an adequate guarantee of the Capital Plan so that the Board of Governors may accept the Capital Plan." And, by statute, the Board of Governors can accept a proposed capital restoration plan only if it includes the bank holding company's guaranty. *See* 12 U.S.C. § 1831o(e)(2)(C)("The appropriate Federal banking agency shall not accept a capital restoration

-15-

plan unless the agency determines that . . . . if the insured depository institution is undercapitalized, each company having control of the institution has (I) guaranteed that the institution will comply with the plan until the institution has been adequately capitalized on average during each of 4 consecutive calendar quarters and (II) provided appropriate assurances of performance."). *Cf. Wolkowitz v. Fed. Deposit Ins. Corp. (In re Imperial Credit Indus., Inc.,),* 527 F.3d 959, 967 (9th Cir. 2008)(finding an enforceable guaranty existed where "[t]he language of the performance guaranty clearly demonstrates that [the bank holding company] intended to comply with the statutory framework governing undercapitalized institutions . . . . [and that it] was fully aware that an enforceable performance guarantee was required in order for the FDIC to approve [the bank's] capital plan . . ."). The Board Resolution not only tracks the language contained in the statute, but also uses guaranty language and evidences an intent to comply with the statutory requirements necessary to obtain approval of the proposed capital restoration plan. Based on this language the Court concludes that Bancorp has made a commitment to maintain the capital of the Bank for purposes of 11 U.S.C. § 507(a)(9).

Having determined that the language in the relevant documents is sufficient to constitute a commitment to maintain the capital of the Bank, FDIC-R would have the Court conclude that Count I must be dismissed. This Court disagrees. Concluding that Bancorp made a commitment to maintain the capital of the Bank does not end the inquiry. To sustain a claim based on a commitment to maintain the capital, Bancorp must have breached that commitment. The Complaint contains the following allegations:

> As the approximately $100 million in trust preferred securities debt remained on the Debtor's books, the Debtor struggled to close a deal with third party investors to adequately capitalize the Bank. The Debtor's efforts included engaging an investment banking firm, which brought in 13 investor groups for a potential whole bank purchase, each of which declined to go forward, as well as 8 private equity firms that performed diligence on a private placement transaction, with a single private equity firm called Mill

Creek Capital raising enough funds from its investors to satisfy the capital raising terms of the Capital Restoration Plan ("Mill Creek Transaction"). The proposed Mill Creek Transaction involved the capital investors purchasing 2,227500 shares of common stock for $210 million, in which the Debtor's holdings in the Bank would be diluted to just 1 per cent. The Debtor's board decided it was in its shareholders' and long-standing bank customers' best interest for it to hold 1 percent of a recapitalized Bank than 100 percent of a failed Bank. However, the Mill [Creek] Transaction was not selected by the Federal Deposit Insurance Company, as it preferred a whole bank purchase by another bidder with whom it had been negotiating a purchase and assumption agreement.

Complaint, ¶ 36.

The Debtor complied with its obligations under the Capital Restoration Plan and the Board Resolution.

Complaint, ¶ 47.

The gravamen of the Capital Restoration Plan that was approved by the Board of Governors was the Debtor assisting the Bank by agreeing to take affirmative steps to try and retire $100 million in debt and raise in excess of $200 million in third party capital. The steps for such efforts were set out in the Capital Restoration Plan and approved by the Board of Governors. In its proof of claim, the FDIC-R does not state that the Debtor failed to take any of these steps under the Capital Restoration Plan and Board Resolution, as it cannot.

Complaint, ¶ 55.

These allegations sufficiently state a plausible claim that Bancorp did not, in fact, breach its commitment to maintain the capital of the Bank, particularly in light of the alternative structure contemplated by the Capital Restoration Plan. *See* Capital Restoration Plan, Conclusions, ¶ 4. If Bancorp can demonstrate that it was able to raise sufficient funds to restore the capital of the Bank at a level committed under the terms of the Capital Restoration Plan in accordance with the terms of the Capital Restoration Plan, Bancorp can defeat FDIC-R's claim based on a lack of breach. Consistent with the claims objection process set out in 11 U.S.C. § 502, the Court will allow a claim "except to the extent that such claim is unenforceable against the debtor . . . under any agreement or applicable law." 11 U.S.C. § 502(b)(1). As noted by the Tenth Circuit in *Overland Park,* a debtor who has made a commitment to maintain the capital of an FDIC-insured institution should be "held to its commitment absent a defense." *Overland Park,* 236 F.3d at

-17-

1253.  Bancorp's defense is the lack of breach.  If Bancorp did not breach its commitment under the Board Resolution and the Capital Restoration Plan, or if FDIC-R wrongfully prevented Bancorp from carrying out its commitment, FDIC-R's claim would not be enforceable.  *Cf. Vineyard,* 2013 WL 1867986 at *4 (finding, alternatively, that even if the applicable documents sufficiently established a "commitment" under §365(o), there was "no breach of such commitment that would support a priority claim under § 507(a)(9) . . . . there was no evidence that the Debtor abandoned efforts to raise the funds to implement a capital plan nor was there a deadline to do so.").  The Court will not, therefore, dismiss Count I based on the fact that Bancorp made a commitment to maintain the capital of the Bank within the meaning of 11 U.S.C. § 570(a)(9).

> 2) *Whether the Commitment to Maintain the Capital of the Bank was Made to a "Federal Depository Institutions Regulatory Agency" for purposes of 11 U.S.C. § 507(a)(9)*

FDIC-R bases its claim on 11 U.S.C. § 507(a)(9), which gives ninth priority in Chapter 7 cases to "allowed unsecured claims based upon any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution." 11 U.S.C. § 507(a)(9).  The Bankruptcy Code defines "Federal depository institutions regulatory agency" as follows:

> (A) with respect to an insured depository institution (as defined in section 3(c)(2) of the Federal Deposit Insurance Act) for which no conservator has been appointed, the appropriate Federal banking agency (as defined in section 3(q) of such Act);
>
> (B) with respect to an insured credit union (including an insured credit union for which the National Credit Union Administration has been appointed conservator or liquidating agent), the National Credit Union Administration;
>
> (C) with respect to any insured depository institution for which the Resolution Trust Corporation has been appointed conservator or receiver, the Resolution Trust Corporation; and

-18-

(D) with respect to any insured depository institution for which the Federal Deposit Insurance Corporation has been appointed conservator or receiver, the Federal Deposit Insurance Corporation.

11 U.S.C. § 101(21B).

The Federal Deposit Insurance Act ("FDIA") defines "insured depository institution" as:

any bank or savings association the deposits of which are insured by the Corporation [FDIC][4] pursuant to this chapter.

12 U.S.C. § 1813(c)(2).

For State member banks, the "appropriate Federal banking agency" is the "Board of Governors of the Federal Reserve System." *See* 12 U.S.C. § 1813(q)(3)(A)("The term 'appropriate Federal banking agency' means-- . . . . the Board of Governors of the Federal Reserve System, in the case of any State member bank").

The Bank is a State member bank. *See* Complaint, ¶ 11. The Trustee asserts that because creditors' rights are generally fixed as of the petition date, and because the FDIC-R had been appointed receiver of the Bank as of the petition date, the Bankruptcy Code's applicable definitional section is 11 U.S.C. § 101(21B)(D) such that commitment must have been made to the Federal Deposit Insurance Corporation rather than the Board of Governors in order to give rise to a priority claim under 11 U.S.C. § 507(a)(9). *See* 11 U.S.C. § 101(21B)(D). This Court disagrees.

The alleged commitment is contained in Bancorp's Board Resolution dated June 4, 2010. At that time, the Bank was a state member bank for which FDIC had not been appointed as receiver. Thus when the commitment was made, the "appropriate federal banking agency" under the FDIA, and the consequent "federal depository regulatory agency" for purposes of 11 U.S.C.

---

[4] For purposes of the FDIA the Federal Deposit Insurance Corporation is referred to as the "Corporation." 12 U.S.C. § 1811(a)("There is hereby established a Federal Deposit Insurance Corporation (hereinafter referred to as the 'Corporation') which shall insure . . . the deposits of all banks . . . which are entitled to the benefits of insurance under this chapter . . .").

§ 507(a)(9) was the Board of Governors of the Federal Reserve System. *See* 11 U.S.C. § 101(21B)(A); 12 U.S.C. § 1813(q)(3)(A). Bancorp and the Bank together submitted the Capital Restoration Plan to the Federal Reserve Bank and to the Financial Institutions Division of the State of New Mexico. The Board Resolution recites that: a) the Bank has submitted a capital restoration plan to the Board of Governors; and b) that Bancorp "desires to execute this Resolution in order to provide adequate guarantee of the Capital Plan so that the Board of Governors may accept the Capital Plan." Bancorp's Board Resolution. Bancorp's Board Resolution further states that its guaranty is "a commitment to the Board of Governors." *Id.* The alleged commitment to maintain the Bank's capital was therefore made to the appropriate "Federal depository institutions regulatory agency" for purposes of 11 U.S.C. § 507(a)(9).

The Trustee's argument that the petition date is the proper time frame to determine what agency is the appropriate "federal depository regulatory agency" is unavailing. Because the alleged commitment to maintain the Bank's capital is based on Bancorp's Board Resolution, which references the July 2, 2009 Written Agreement, and the Capital Restoration Plan, the applicable time period for examining the alleged commitment for purposes of § 507(a)(9) is when the commitment was made, not the petition date, which occurred several months later.

3) *Whether the Commitment to Maintain the Capital of the Bank Terminated Upon the Appointment of FDIC-R*

The Trustee contends that any alleged commitment to maintain the capital of the Bank terminated upon the appointment of FDIC as receiver for the Bank. She reasons that Bancorp lost its control over the Bank upon the appointment of FDIC-R and therefore could no longer attempt to raise capital for the Bank. Because the Bank was closed before the date Bancorp filed its voluntary Chapter 7 petition, and because rights and obligations are generally established as of the petition date, the Trustee concludes that any alleged commitment by Bancorp to maintain

-20-

the capital of the Bank terminated pre-petition. Again, this Court disagrees. As the Fourth

Circuit pointed out in *Firstcorp,* even if the receivership arguably terminates the bank holding

company's control over its subsidiary bank, that termination operates

> only to absolve [the bank holding company] of any obligation to *continue* maintaining
> [the subsidiary bank's] capital and thereby clear[s] it of any liability arising from *further*
> deterioration of [the subsidiary bank's] capital . . . . Termination in no way absolved [the
> bank holding company] of the existing, matured liability . . .

*Firstcorp,* 973 F.2d at 251 (emphasis in original).

Thus the fact that Bancorp could no longer attempt to raise capital for the Bank after FDIC-R's

appointment and the Bank's closure does not mean that any existing liability based on the

commitment to maintain the capital of the Bank was extinguished. Rather, the amount of the

alleged commitment could not be increased after January 28, 2011, the date the Bank was closed

and FDIC-R was appointed receiver.[5] *Cf. Franklin,* 303 B.R. at 500 (agreeing with *Firstcorp,*

and finding that the OTS held a valid claim based on a capital commitment for any matured

deficiency that existed as of the date of the appointment of RTC as conservator).[6] The Court will

grant the Motion to Dismiss Count I with respect to the Trustee's argument that FDIC-R's claim

must be disallowed because Bancorp's commitment terminated pre-petition.

4) *Whether FDIC-R has Standing to Enforce the Commitment to Maintain the Capital of
   the Bank*

As determined above, the commitment to maintain the capital of the Bank was made to

the Board of Governors, and not to the FDIC-R. The Trustee, therefore, questions FDIC-R's

standing to enforce the alleged commitment to maintain the capital of the Bank. In response,

FDIC-R contends that it has standing to enforce the alleged commitment on three grounds: a) as

---

[5]FDIC-R fixed the amount of its claim as of September 30, 2010, the date of the November 10-Q. *See* Claim No. 9-
2.
[6]Because no capital deficiency existed as of that date, the *Franklin* court concluded that OTS did not have a valid
capital deficiency claim against the bankruptcy estate. *Franklin,* 303 B.R. at 501.

successor to the Board of Governors; b) as successor to the Bank; and c) as the intended third-party beneficiary of the alleged commitment. Section 1831aa(a) of Title 12 provides:

(a) In general

Notwithstanding clause (i) or (ii) of section 1818(b)(6)(A) of this title or section 1831o(e)(2)(E)(i) of this title, the appropriate Federal banking agency for a depository institution may enforce, under section 1818 of this title, the terms of--

**(1)** any condition imposed in writing by the agency on the depository institution or an institution-affiliated party in connection with any action on any application, notice, or other request concerning the depository institution; or

**(2)** any written agreement entered into between the agency and the depository institution or an institution-affiliated party.

12 U.S.C. § 1831aa(a).

Section 1831aa(b) of Title 12 provides:

After the appointment of the Corporation as the receiver or conservator for a depository institution, the Corporation may enforce any condition or agreement described in paragraph (1) or (2) of subsection (a) imposed on or entered into with such institution or institution-affiliated party through an action brought in an appropriate United States district court.

12 U.S.C. § 1831aa(b).

FDIC-R relies on 12 U.S.C. § 1831aa(b) to demonstrate that FDIC-R, as successor to the Board of Governors, has standing to enforce the commitment to maintain the capital of the Bank. The Trustee observes that this provision gives the "Corporation," not the receiver, the right to enforce the referenced agreements after appointment of a receiver. The "Corporation" is defined earlier in Title 12 as the Federal Deposit Insurance Corporation. *See* 12 U.S.C. § 1811(a)("There is hereby established a Federal Deposit Insurance Corporation (hereinafter referred to as 'Corporation') . . . "). The language of 12 U.S.C. § 1831aa(b) could thus be interpreted to require enforcement by the Federal Deposit Insurance Corporation in its corporate capacity, rather than in its capacity as receiver. 12 U.S.C. § 1831aa(b)("the **Corporation** may enforce . . .

-22-

"). On the other hand, subsection (a) generally provides that "the appropriate Federal banking agency . . . may enforce . . . the terms of . . . any written agreement entered into between the agency and the depository institution or an institution-affiliated party." 12 U.S.C. § 1831aa(a). Subsection (b) then sets forth what is to happen *after* the appointment of the "Corporation" as conservator or receiver. 12 U.S.C. § 1831aa(b). Given this context, the language of subsection (b) could also be interpreted to mean that "[a]fter appointment of the Corporation as the receiver . . . the Corporation [as receiver] may enforce any condition or agreement . . . ." The Court believes this is the most natural reading of the section. This reading is also supported by the legislative history.

When the language of a statute is capable of two different, but reasonable interpretations, an ambiguity exists. *See In re Geneva Steel Co.,* 281 F.3d 1173, 1178 (10th Cir. 2002)("An '[a]mbiguity exists when a statute is capable of being understood by reasonably well-informed persons in two or more different senses.'")(quoting 2A Norman J. Singer, *Statutes and Statutory Construction,* § 45.02 at 11-12 (6th ed. 2000)). The Court may look to legislative history as an aid to interpret an ambiguous statute. *See Geneva Steel,* 281 F.3d at 1178 ("If a statute is ambiguous, a court may seek guidance from Congress' intent, a task aided by reviewing the legislative history.")(citing *United States v. Simmonds,* 111 F.3d 737, 742 (10th Cir. 1997)).

The legislative history evidences Congressional intent to allow the FDIC-R to enforce under this section any written agreement entered into between an appropriate Federal banking agency and an institution-affiliated party. The Senate Report relating to this subsection provides: "this section clarifies existing FDIC authority as receiver or conservator to enforce written conditions or agreements." S.Rep. 109-256, 109th Cong., 2nd Sess. 2006, *reprinted in* 2006 U.S.C.C.A.N. 1219, 1226. In light of this indication of Congressional intent, the Court finds that

-23-

FDIC-R has sufficient standing to assert a claim based on Bancorp's commitment to maintain the capital of the Bank. This interpretation is not inconsistent with Tenth Circuit authority.

*Overland Park* expressly did not consider whether the Resolution Trust Corporation or the Federal Deposit Insurance Corporation, as receiver, had standing to file and pursue a proof of claim based on a capital commitment, but concluded that the Office of Thrift Supervision, which succeeded to the two agencies involved in the stipulation constituting the commitment to maintain capital, could pursue the claim. *See Overland Park,* 236 F.3d at 1254 (finding that "Thrift Supervision is entitled, if not obligated to pursue its capital maintenance claim" since it succeeded to the two agencies involved with the stipulation, and noting that, because neither RTC nor FDIC was a party to the litigation, the court would not address their standing as receiver to pursue the claim). In the same vein, FDIC-R succeeded to the Board of Governors, the appropriate Federal depository institutions regulatory agency to which Bancorp's capital commitment was made, for purposes of enforcing the commitment.

Having determined that FDIC-R has standing to enforce the capital maintenance guaranty based on its succession to the interests of the Board of Governors, the Court need not address the FDIC-R's remaining arguments with respect to its standing to assert its claim. The Trustee cannot avoid her obligation under the capital maintenance guaranty based on a lack of standing.

5) *Whether FDIC-R Timely filed its Proof of Claim*

The last date for filing proofs of claim in a Chapter 7 case generally is ninety days after the first date set for the meeting of creditors. *See* Fed.R.Bankr.P. 3002(c)("In a chapter 7 liquidation, . . . a proof of claim is timely filed if it is filed not later than 90 days after the first date set for the meeting of creditors called under § 341(a) of the Code"). An exception to the 90-day claims bar date exists with respect to claims filed by "governmental units." *See*

-24-

Fed.R.Bankr.P. 3002(c)(1). For governmental units, the claims bar date in a Chapter 7 case is 180 days after the date of the order for relief. *See* Fed.R.Bankr.P. 3002(c)(1)("A proof of claim filed by a governmental unit . . . is timely filed if it is filed not later than 180 days after the date of the order for relief."). The date of the order for relief in a Chapter 7 case is the petition date. *See* 11 U.S.C. § 301(b)("The commencement of a voluntary case under a chapter of this title constitutes an order for relief under such chapter."). Bancorp filed a voluntary petition under Chapter 7 of the Bankruptcy Code on April 27, 2011. The 180th day following the order for relief was October 24, 2011. FDIC-R filed its proof of claim on that date.

The Trustee reasons that, because FDIC-R succeeds to the rights of the Bank,[7] its rights are necessarily limited to the rights of the Bank such that FDIC-R was required to file its claim by the general claims bar date applicable to creditors that are not governmental units. The Trustee also contends that FDIC-R is not a "governmental unit." Again, this Court disagrees.

"Governmental unit" as defined by the Bankruptcy Code includes departments, agencies, or instrumentalities of the United States. *See* 11 U.S.C. § 101(27)("The term 'governmental unit' means . . . department, agency, or instrumentality of the United States . . ."). Congress intended for this definition to be interpreted broadly. *See T I Fed. Credit Union v. DelBonis,* 72 F.3d 921, 930-931 (1st Cir. 1995)("Legislative history suggests that Congress intended to 'defin[e] 'government unit' in the broadest sense.'")(quoting H.Rep. No. 95-595, 95th Cong. 1st Sess. 311 (1977)(U.S.C.C.A.N. 1978, pp. 5759, 5963, 6268). The Federal Deposit Insurance Corporation is an agency of the United States falling within the Bankruptcy Code's definition of "governmental unit." *See, Fed. Deposit Ins. Corp. v. Wright (In re Wright),* 87 B.R. 1011, 1015 (Bankr.D.S.D. 1988)(stating that "the FDIC is a governmental unit" and pointing out that "[t]he

---

[7]*See* 12 U.S.C. § 1821(d)(2)(A)(i)("The Corporation shall, as conservator or receiver, and by operation of law, succeed to . . . all rights, titles, powers and privileges of the insured depository institution . . . ").

-25-

FDIC has been held to be an agency of the United States for purposes of Title 28 of the United States Code and the Federal Rules of Civil Procedure, as well as the Federal Tort Claims Act.")(citations omitted).  But is the FDIC in its capacity as *receiver* nevertheless an agency or instrumentality of the United States, and, consequently a "governmental unit"?

The Trustee points out that there is a distinction between the FDIC as "Corporation" and FDIC when acting as receiver.  *See, Fed. Deposit Ins. Corp. v. Roldan Fonseca,* 795 F.2d 1102, 1109 (1st Cir. 1986)("'Corporate' FDIC and 'Receiver' FDIC are separate and distinct legal entities.")(citing *Jones v. Fed. Deposit Ins. Corp.,* 748 F.2d 1400, 1402 (10th Cir. 1984)(remaining citation omitted)).  *See also, In re Butcher,* 32 B.R. 572, 575-576 (Bankr.E.D.Tenn. 1983)(FDIC is one entity when acting in its corporate capacity and a second entity when acting as receiver of a bank).  Some of the cases the Trustee cites conclude that the FDIC, when acting as receiver, is not an agency of the United States.  *See, e.g., Perpetual Fin. Corp. v. United States,* 61 Fed.Cl. 126, 145 (Fed.Cl. 2004)(observing that, "[w]hen acting in its receivership capacity, the FDIC is not an agency of the United States.")(citation omitted); *Shock v. Fed. Deposit Ins. Corp.,* 118 F.Supp.2d 165, 169– 170 (D.R.I. 2000), *aff'd sub nom. Shock v. United States,* 254 F.3d 1 (1st Cir. 2001)(concluding that the FDIC in its capacity as receiver is not a federal agency for purposes of the Equal Access to Justice Act, reasoning that the FDIC, as receiver, "does not act on behalf of the United States government, and it does not perform any function unique to the federal government.").  However, the Court has found no case determining whether FDIC-R is a governmental unit for purposes of timely filing a proof of claim in a bankruptcy case, nor has either party cited a case for this proposition to the Court.

Whether an entity constitutes a governmental unit or federal instrumentality depends on "'whether it performs an important government function.'"  *DelBonis,* 72 F.3d at 931 (quoting

*United States v. Michigan,* 851 F.2d 803, 806 (6th Cir. 1988)).  In *Marshack v. Tapager (In re Motivation Resources, Inc.),* 158 B.R. 184 (Bankr.C.D.Cal. 1993) the bankruptcy court had little trouble concluding that the FDIC, as receiver, is a governmental unit for purposes of waiving sovereign immunity under 11 U.S.C. § 106.  The *Motivation Resources* court acknowledged that "the FDIC operates in two separate and distinct legal capacities as corporate insurer of accounts and as receiver for failed financial institutions," but pointed out that, "[w]hen the FDIC is functioning in its capacity as receiver, it acts as an instrument of the federal government, providing security for financial transactions in this country." *Motivation Resources,* 158 B.R. at 186 an 187 (citations omitted).  Ultimately the *Motivation Resources* court found that "[t]he FDIC, in either of its capacities, is at the very least an instrumentality of the federal government." *Id.* at 187.[8]

In addition, the Court notes that 12 U.S.C. § 1819(b)(1) of FIRREA provides that "[t]he Corporation, *in any capacity,* shall be an *agency of the United States* for purposes of section 1345 of Title 28, without regard to whether the Corporation commenced the action."  12 U.S.C. § 1819(b)(1)(emphasis added).  Even though the agency authority established under this section is tied to a jurisdictional provision found in Title 28, not Title 11's Bankruptcy Code, this section lends further support to the Court's conclusion that the FDIC-R is a governmental unit for purposes of Fed.R.Bankr.P. 3002(c)(1).  The FDIC-R timely filed its proof of claim by the claims bar date applicable to governmental units.  The Motion to Dismiss Count I will be granted

---

[8]*Cf. United States v. Sweeney,* 226 F.3d 43, 45 (1st Cir. 2000)(observing that, by enacting FIRREA, "Congress made pellucid that, in acting as receiver of failed banks, the FDIC fosters important public policies relating to the avoidance of a national banking crisis.")(citation omitted).  *But cf. Shock,* 118 F.Supp.2d at 169-170 (observing that "[a]s receiver, the FDIC does not act on behalf of the United States government, and it does not perform any function unique to the federal government. Instead, it acts on behalf of the failed bank in the interest of that bank's creditors."). *Shock* relied on a First Circuit decision which held "that the FDIC, acting as receiver, does not qualify as a federal instrumentality for purposes of the  Tax Injunction Act" to conclude that the FDIC, as receiver, is not an agency of the United States for purposes of the Equal Access to Justice Act.  *Shock,* 118 F.Supp.2d at 170 (citing *Bank of New England Old Colony v. Clark,* 986 F.2d 600, 603 (1st Cir. 1993)).

with respect to the Trustee's claim that FDIC-R's proof of claim must be denied because it was not timely filed.

CONCLUSION

Based on the foregoing, the Court will grant the Motion to Dismiss Count I, in part.  The following grounds raised by the Trustee in her Complaint fail as a matter of law:  1) the commitment to maintain the capital was not made to a "Federal depository institutions regulatory agency" for purposes of 11 U.S.C. § 507(a)(9);  2) Bancorp's obligations under the commitment to maintain the capital of the Bank terminated pre-petition;  3) FDIC-R lacks standing to assert a claim based on  Bancorp's commitment to maintain the capital of the Bank; and 4) FDIC-R's proof of claim was untimely.  With respect to the Trustee's argument that Bancorp did not make a commitment to maintain the capital of the Bank, the Court concludes that the language in the Board Resolution, the July 2, 2009 Written Agreement, and the Capital Restoration Plan establishes that Bancorp did make a commitment to maintain the capital of the Bank for purposes of asserting a priority claim under 11 U.S.C. § 507(a)(9).  However, Count I of the Complaint also sufficiently sets forth a defense to FDIC-R's claim.  The Court will not, therefore, dismiss Count I of the Complaint in full.  A separate order consistent with this Memorandum Opinion will be entered.

ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: July 3, 2014

COPY TO:

**Corali Lopez-Castro**
Kozyak Tropin & Throckmorton PA
Attorney for Plaintiff
2525 Ponce De Leon 9th Floor
Miami, FL 33134

**David Aaron Samole**
Kozyak Tropin & Throckmorton PA
Attorney for Plaintiff
2525 Ponce De Leon 9th Floor
Miami, FL 33134

**Paul Thomas Musser**
Katten Muchin Rosenman LLP
Attorney for Defendant
525 W. Monroe St., Suite 1900
Chicago, IL 60661-3693

**Jeffrey A. Sandell**
Federal Deposit Insurance Corporation
1601 Bryan St, 15th Floor
Dallas, TX 75201

**Joshua David Wayser**
Katten Muchin Roseman LLP
Attorney for Defendant
2029 Century Park East, Ste 2600
Los Angeles, CA 90067